# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

JERRY CLARK,

                                        Plaintiff,

        v.                                              1:14-CV-1349
                                                        (TJM/ATB)
COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

JERRY CLARK, Plaintiff pro se
SERGEI ADEN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

        This matter was referred to me for report and recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b)

and Local Rule 72.3(d).  This case initially proceeded in accordance with General

Order 18.  However, because plaintiff is pro se, the court issued an order on March 12,

2015, which directed plaintiff to file a brief in support of his position. (Dkt. No. 12).

After obtaining an extension of time from the court, plaintiff filed his "brief" on May 7,

2015. (Dkt. No. 15).  On June 17, 2015, the court granted plaintiff's request to file a

"motion." (Dkt. Nos. 16, 17).  On July 1, 2015, plaintiff filed a "Supplement" to his

brief, requesting that he be permitted to present new evidence. (Dkt. No. 18).  On July

29, 2015, defendant filed a brief in support of the Commissioner's position and in

response to plaintiff's request to present new evidence. (Dkt. No. 20).

# I.    PROCEDURAL HISTORY

On October 17, 2008, plaintiff "protectively filed"[1] an application for Disability Insurance Benefits ("DIB"), alleging disability, beginning December 11, 2006, due to diabetes mellitus.[2] (Administrative Transcript ("T") at 228-31, 116, 260, 267). Plaintiff's application was denied initially on February 4, 2009.[3]  Plaintiff requested a hearing which was held on April 5, 2010 before Administrative Law Judge ("ALJ") Carl Stephan. (T. 82-115).  ALJ Stephan issued an unfavorable decision on May 12, 2010. (T. 117-30).  Plaintiff appealed ALJ Stephan's decision, and on May 17, 2012, the Appeals Council remanded the case to ALJ Stephan for further administrative proceedings and a new decision. (T. 131-35, 174-75).

ALJ Stephan held a new hearing on March 7, 2013, at which plaintiff and Vocational Expert ("VE") Sugi Y. Komarov testified.  On April 19, 2013, ALJ Stephan issued a decision finding that plaintiff was not disabled under the Act from December 11, 2006 until December 30, 2011, the date that plaintiff was last insured. (T. 9-27).

---

[1] The term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits.  *See* 20 C.F.R. §§ 404.630, 416.340.  If a statement meeting the requirements of the regulations is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a later date.

[2] Although defendant has not addressed the issue, and it does not affect this court's decision, it appears that on November 7, 2008, plaintiff also filed an application for Supplemental Security Income ("SSI"). (T. 225-27).  It also appears that plaintiff's application for SSI benefits was denied because his "nonexcludable resources exceed[ed] title XVI limitations." (T. 232).  There appears to have been no challenge to this denial, and therefore, the court is only considering plaintiff's application for disability insurance benefits.

[3] The denial of benefits indicates a "secondary diagnosis" of "adjustment disorder," but this secondary diagnosis did not form the basis for plaintiff's application. (*See* T. 260).

This decision became the final decision of the Commissioner on September 25, 2014, when the Appeals Council denied plaintiff's request for review. (T. 1-5).

## II.  GENERALLY APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the

3

[Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.    Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include

4

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859

F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its

interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v.*

*Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence

in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles*

*v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ

explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ

cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz*

*v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No.

09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.   THE ALJ'S DECISION

The ALJ first found that, for purposes of DIB, plaintiff last met his insured status

on December 31, 2011, and that plaintiff had not engaged in substantial gainful activity

since his alleged disability onset date of December 11, 2006. (T. 14). The ALJ found

that plaintiff had the following severe impairments at step 2 of the disability

determination – diabetes mellitus, hypertension, and diabetic neuropathy. (*Id.*) The

ALJ also found that plaintiff's treating physician, Dr. Kumar Shah, reported some

evidence of sinus tachycardia, but EKG findings in 2007 revealed essentially normal

finding, and the ALJ determined that this impairment was not severe. (T. 15).

In addition, giving great weight to consultative psychologist Seth Rigberg, Ph.D.,

the ALJ found that, to the extent that plaintiff was diagnosed with adjustment disorder with mixed anxiety and depressed mood, these impairments did not cause more than "minimal limitations" on plaintiff's ability to perform basic mental work activities and were, therefore, not severe. (T. 15). In making this determination, the ALJ gave some consideration to the assessment by non-examining State Agency consultant J. Dambrocia, Ph.D. However, the ALJ did not give this report "controlling weight" because Dr. Dambrocia did not examine plaintiff. (*Id.*)

In his determination that plaintiff's mental impairments were not severe, the ALJ also considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments,[4] known as the "paragraph B" criteria. (T. 16). The ALJ found that plaintiff had no limitations in activities of daily living and social functioning. (T. 16). Plaintiff had mild limitations in concentration, persistence, or pace, and no episodes of decompensation. (*Id.*) Because plaintiff's limitations caused no more than "mild" limitations in any one of the first three areas and no episodes of decompensation, the ALJ found that plaintiff's mental impairment was not severe. (*Id.*) Because the "paragraph B" criteria do not constitute a Residual Functional Capacity ("RFC") assessment, for purposes of steps 4 and 5 of the sequential evaluation, the ALJ noted that his following RFC determination reflected his paragraph B findings, but contained a more detailed assessment. (T. 16-17). The ALJ also found that Part C of the criteria found in the Listing of Impairments was not met. (T. 17).

---

[4] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.

At step 3 of the disability analysis, the ALJ found that plaintiff's impairments did not meet the severity of any Listed Impairment. (T. 17). In making his step 3 determination, the ALJ considered Listing 4.00 – Cardiovascular Disorders; Listing 9.00 – Endocrine Disorders; and Listing 11.00 – Neurological Disorders. (*Id.*) The ALJ found that the record did not document episodes of diabetic ketoacidosis, seizures, or inpatient hospital treatment due to plaintiff's diabetes or to his high blood pressure levels. He did not exhibit disorganization of motor function, and he had normal gait, station, and the ability to use his upper and lower extremities for fine and gross motor function. (*Id.*)

At step 4 of the sequential evaluation, the ALJ found that, through the date plaintiff was last insured, he had the RFC to sit for 8 hours and stand and walk for 6 hours each in an 8-hour workday. (T. 17). Plaintiff could stand and walk for 1 hour at a time before changing positions briefly, and he could sit for 1 hour at a time before changing positions briefly. He could lift and carry 25 pounds frequently and 50 pounds occasionally, and he could occasionally climb stairs, stoop, crouch, crawl, kneel, and balance, but he could never climb ladders or scaffolds. (*Id.*) The ALJ specifically stated that he considered the record as a whole, including the impairments that he did not find to be severe, and including plaintiff's testimony at both administrative hearings. (*Id.*)

The ALJ considered plaintiff's education and post-high school training in pharmacy, phlebotomy, and bookkeeping. (T. 18). The ALJ gave great weight to the January 2009 report by consultative physician Kautilya Puri, M.D., while giving less

weight to plaintiff's treating physician Dr. Shah. (T. 18). The ALJ carefully considered all the medical evidence, including the April, 2010 report by Dr. Virinchi Bala, M.D., another treating source, who instructed plaintiff to be more compliant with his medications and informed him that his neuropathy would improve with better control of his diabetes. (T. 19).

The ALJ also obtained the assistance of Dr. Leonard Rubin, M.D., a medical expert to help establish the severity of his impairments, including whether any of them rose to the level of listed impairments. (T. 20). Dr. Rubin reviewed plaintiff's medical evidence, and found that from December 11, 2006 until December 31, 2011, none of the plaintiff's impairments met the severity of listed impairments, and he determined that plaintiff retained the RFC to frequently lift 20 pounds and occasionally lift 100 pounds, even though he was unable to determine the exact amount that plaintiff could carry. (*Id.*) However, Dr. Rubin did determine that plaintiff could sit for 8 hours and stand and walk 6 hours each during an 8-hour workday. Dr. Rubin found that plaintiff could continuously use his hands for activities including reaching, handling, fingering, pushing, and pulling. He could continuously climb stairs and ramps, balance, stoop, kneel, and crouch, and he had no environmental limitations. (*Id.*) The ALJ gave Dr. Rubin's assessment great weight, even though the ALJ found that plaintiff could lift and carry 25 pounds frequently, but only 50 pounds occasionally. (T. 21).

The ALJ found that his RFC was supported by the evidence. (*Id.*) The ALJ also found that plaintiff's credibility was weakened by inconsistencies between his allegations, his stated activities of daily living, and the objective evidence. (T. 18, 21).

The ALJ did not doubt that plaintiff experienced some level of pain and limitation, but only to the extent described in the ALJ's RFC evaluation. (T. 21).

The ALJ found that plaintiff was capable of performing his past work as a quality assurance inspector. (T. 21). In making this determination, the ALJ considered the testimony of VE Komarov. (T. 21). The VE found that plaintiff's former occupations required light to sedentary exertional ability. The VE also assessed plaintiff's former work as skilled and semi-skilled. Based upon the hypothetical question asked by the ALJ, which mirrored the RFC evaluation noted above, the VE testified that the plaintiff would have the RFC to perform his past work, including packaging material inspector. The ALJ thus stopped at step 4 of the sequential evaluation and found that plaintiff was not disabled because he could perform his prior work.

## IV. ISSUES IN CONTENTION

Plaintiff's original brief contains three points, but he is essentially making two arguments.[5] (Dkt. No. 15).

(1)     The Commissioner did not properly evaluate treating physician, Dr. Kumar Shah's opinion. (Pl.'s Points 1 & 2).

(2)     Plaintiff was unaware that he could have requested the Appeals Council to "review[] the entire case," but he did not ask for such review. (Pl.'s Point 3). The court interprets this claim as arguing that the Commissioner's decision was not supported by substantial evidence.

Plaintiff's supplemental brief appears to be an attempt to ask the court to

---

[5] Because plaintiff is pro se, this court will interpret his papers as raising the strongest arguments they suggest. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

consider new medical evidence, relating to incidents that occurred "after the last appeal was submitted." (Dkt. No. 18-1). Some of the documents that plaintiff attaches to his supplemental brief already appear in the administrative transcript, and some appear to be new medical documents that were not considered by the Commissioner at any level of administrative review.

Defendant asks the court to affirm the Commissioner's decision. (Dkt. No. 20). The Commissioner argues that the "new" medical records do not support a remand under the Social Security Act, that the ALJ properly assessed plaintiff's RFC, and that the ALJ properly found that plaintiff could perform his prior work. For the following reasons, this court agrees with the defendant and will recommend that the court affirm the Commissioner's decision.

## V.    FACTS

Plaintiff had two hearings before the same ALJ.[6]  Plaintiff appeared pro se at the first hearing in April of 2010 and was represented by counsel at his second hearing in March of 2013. At the time of the second hearing, plaintiff was 57 years old. He graduated from high school, took some post-high school training courses and obtained "certificates" in pharmacy technology; phlebotomy; EKG; and word processing. (T. 33). In October of 1995, plaintiff began working for Pfizer as a temporary employee. (T. 34). He was eventually placed on the permanent payroll and worked there as a quality assurance inspector until he was laid off in October of 2006. (T. 34-36).

---

[6] The court will focus on the more recent hearing, but may cite facts from both hearings during the discussion of the issues presented.

Plaintiff testified that after he left Pfizer, he decided to go to college and began taking nursing[7] courses at LaGuardia Community College. (T. 35). He attended LaGuardia from September of 2007 until January of 2008. (*Id.*) Plaintiff testified that he completed the semester, but decided that he did not like the style that certain professors used and he discontinued the program. (T. 35-36).

Plaintiff testified that before he worked for Pfizer, he worked for Bank Leumi, and he also held a variety of very short-term temporary jobs. (T. 38). Plaintiff has performed customer service as well as accounting work. (T. 38-39). At Bank Leumi, plaintiff was an accounts manager/collector. (T. 39). He telephoned individuals to remind them that they were late with their loan payments. (*Id.*) Plaintiff also testified that prior to Bank Leumi, he worked at Banker's Trust, where he began as an accounting clerk and was promoted to collections. (T. 40). He was responsible for customer service, credit inquiries, and occasionally credit investigations. (T. 41).

The ALJ asked plaintiff about the physical requirements and his other job duties when he worked at Pfizer. (T. 41-47). Plaintiff testified that he was responsible for testing tablets after they came out of a dispenser. (T. 41). Plaintiff would perform the job seated, but he would also be required to stand up, go to a container to collect the tablets, return to his seat, and do the testing. (T. 42). Most of the time, plaintiff would have to lift less than ten pounds, but occasionally, he had to inspect a carton which could weigh 25 to 30 pounds. (T. 42). Plaintiff estimated that he would be required to

---

[7] In addition to taking courses specifically for Nursing, plaintiff took related courses in Psychology, English, and Math. (T. 35).

pick up the heavier weight approximately once or twice per hour, although the number of times could vary. (T. 43-44). Plaintiff would alternate sitting and standing frequently; would have to perform a "torque test" on pill bottles; and every half hour, he would have to check the labels on the bottles to make sure the labels were correct. (T. 44). Plaintiff was required to stand up and "walk the lines" to make sure that the people who were packaging the pills were doing their job properly. (T. 44).

Plaintiff testified about other aspects of his quality assurance job, including testing to see if the "powder" was in range for Zithromax. (T. 45-46). This part of plaintiff's job required him to take bottles off the "line," and have them tested by taking the bottles to the laboratory every half hour. (T. 46). This part of the job required him to move back and forth between areas of the building which were on the same floor. (*Id.*)

Plaintiff testified that his diabetes was the reason that he was applying for benefits. (T. 47). He testified that he stopped smoking three months prior to the 2013 hearing and was smoking an "electronic cigarette." (T. 48). Plaintiff also testified that he drank three to four rum and colas every night, but he was trying to cut down on the sugary cola by diluting the cola with club soda. (T. 49). Plaintiff testified that his diabetic neuropathy caused numbness in his feet and prevented him from standing too long. (T. 50). Although plaintiff testified that he had "pain," it was not from the neuropathy. It was from an "old injury." (*Id.*) Plaintiff stated that, although the numbness would fluctuate in severity, he had the numbness all day long, and it prevented him from standing or walking "distances." (T. 51). Plaintiff testified that he

could only stand "for so long," and then he must go and sit down. (T. 51-52). Plaintiff testified that he could go grocery shopping because he would use the cart to steady himself, and that sometimes he feels like he is going to fall, although he never has fallen. (T. 52).

Plaintiff stated that when he was home, he did not stay seated for long periods of time, and he moved around a lot, or he would lie down. (T. 53). Plaintiff testified that he watched movies lying down, and he could not state whether his symptoms prevented him from sitting for long periods because he spent most of the time lying down. (T. 53). Plaintiff stated that the neuropathy would prevent him from doing his old job because he feels like he is going to "keel over" if he stands too long, and he is "forced" to sit down. (T. 54). The ALJ then asked whether plaintiff could do a "sit down job," and plaintiff stated that he could not do such a job. When the ALJ asked why not, plaintiff stated "[b]ecause I don't know . . . I mean, I don't know how long it would be to have to sit for a long period of time." (T. 54).

The ALJ also questioned plaintiff about anxiety, stress, and depression. (T. 56-63). Plaintiff testified that he had problems with "anxiety." (T. 65) When the ALJ asked what the symptoms were, plaintiff stated that he gets "pushy" when he wants things done, and that recently he was remodeling a half-bath in his home, and he was "anxious to get it done." (T. 57). He felt much better after it was done. (T. 57). Plaintiff testified that he had no problem with the contractor because he was "used to him." (*Id.*) Plaintiff stated that at Pfizer, he was accustomed to handling instructions, coaching, and criticism because the company would critique the employees. (T. 58)

13

When the ALJ asked whether plaintiff was suffering from anxiety, plaintiff stated that his "definition" of anxiety was "anxiousness, when you're anxious to get things done." (T. 58).

Plaintiff also testified that he occasionally gets "stressed." His neighbors were "stressful," and the "code enforcer" was coming to plaintiff's house because he complained about a situation that was "stressing" him. (T. 58). However, plaintiff also testified that the anxiety and/or stress did not prevent him from doing any activities of daily living or anything else that he wanted to do. (*Id.*) Plaintiff also testified that he got "depressed at times." (T. 59). He stated that anyone, who was used to having a great livelihood, and who was stricken with an illness that prevented him from feeling well, would be depressed. (*Id.*) However, plaintiff testified that when he feels like he does not want to do anything, he tells himself to "do what you have to do." (T. 60). In response to the ALJ asking plaintiff whether he had periods of time where he cried, plaintiff responded that he cried "once in a while when family members pass away," but not in general. (T. 60). Plaintiff does not take any medication for anxiety or depression. (*Id.*)

Plaintiff testified that he spoke with one of his doctors about depression, but plaintiff did not want to take any more medication. (T. 61). Instead, plaintiff stated that he forced himself to go out and do things, including attending a free gospel show that made him feel better for a couple of days. He testified that he would "take in a show," and that there were fabulous entertainers in this area, so he took advantage of that. This makes him feel good and "snaps [him] out of it." (T. 61).

14

The ALJ asked plaintiff if he was looking for work, but plaintiff stated that he had not been doing so, even though the ALJ reminded plaintiff that he testified at his 2010 hearing that he had been looking for work. (T. 62). Plaintiff stated that it would not be "fair" to the employer because plaintiff was "suffering with this condition," and that at Pfizer the employees had to take an annual physical. (T. 62-63).

The ALJ took the testimony of the VE, who reviewed the plaintiff's prior work and its requirements, and determined that plaintiff had transferable skills to other occupations. (T. 66-68). The ALJ then asked the VE a hypothetical question based on the RFC stated above, and the VE testified that plaintiff could still perform the work that he did at Pfizer as well as the work that he did as a collections clerk. (T. 70-71). The VE noted that plaintiff could perform the quality control clerk position "[a]s performed in the national economy," even though plaintiff testified the he performed the job at a medium exertional level. (T. 71-72).

The ALJ then asked the VE to assume that plaintiff could not return to his prior work, and asked whether there were any other jobs that plaintiff could perform as of his date last insured of December 31, 2011. (T. 72). The VE noted that the jobs would have to be "light" in exertional level because of the plaintiff's "sit/stand option" requirement. (*Id.*) Once again, the VE testified that there were several jobs available, including hand packager; information clerk; and office helper, all having substantial numbers in both the national and the state economy. (T. 72-73).

The ALJ asked a second hypothetical question which assumed that plaintiff could

only stand and walk for two hours during an eight-hour day,[8] and he could only sit for six hours instead of eight hours in a workday. (T. 73). Plaintiff would still require the sit/stand option every hour, but did not need to walk away from his work station. (T. 73-74). The VE testified that there were still jobs that plaintiff could perform, including lens inserter and food/beverage order clerk, both existing in substantial numbers in the national and state economy. (T. 74-75).

The ALJ asked a third hypothetical question, slightly changing the RFC and limiting plaintiff to lifting and carrying only 20 pounds occasionally and 10 pounds frequently, sitting for six hours, and standing and walking for six hours, but retaining the sit/stand option every hour and having the same postural limitations. (T. 75). The VE testified that plaintiff could still do both his Pfizer job (as performed in the national economy), his collections jobs, and the information clerk job. (T. 75-76).

The plaintiff's counsel then questioned the VE and asked her to assume that plaintiff could only stand a maximum of 30 minutes and then would have to sit for 10 to 15 minutes. (T. 78). With those restrictions, the VE stated that plaintiff could not perform his previous work, but that he could still perform the information clerk job and the officer helper job. (T. 78-79). However, if plaintiff could only sit for three to four hours total during the day, then he could not perform any of those jobs. (T. 80).

The record contains medical evidence from before and after plaintiff's last

---

[8] The first hypothetical asked the VE to assume that plaintiff could stand and walk six hours out of an eight-hour day, even though he needed a sit/stand option every hour. (T. 70). The sit/stand option only involved changing positions briefly, and plaintiff would not need to walk away from his work station. (T. 70, 74).

insured date, including reports from plaintiff's current and former treating physicians. However, rather than further detailing the evidence at the outset, relevant details regarding the medical opinion and other evidence, are discussed below as necessary to address the issues that plaintiff has attempted to raise and that the defendant and the court have further identified.

## VI.  NEW EVIDENCE FIRST SUBMITTED TO THE DISTRICT COURT

### A.  Legal Standards

A case may be remanded to the Commissioner for reconsideration based on new evidence first submitted to the district court if the plaintiff is able to show that the new evidence "is material and that there [wa]s good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g). To carry this burden, a plaintiff must show that "(1) the proffered evidence is new and not merely cumulative of what is already in the record; (2) the proffered evidence is material, meaning that it is (a) relevant to his condition during the time period for which benefits were denied; (b) probative; and (c) reasonably likely to have influenced the Commissioner to decide his application differently; and (3) good cause exists for his failure to present the evidence earlier."  *Mulrain v. Commissioner of Social Sec.*, 431 F. App'x 38, 39 (2d Cir. 2011).

### B.  Application

In his request to submit "new evidence," plaintiff states that he has had two tragic accidents after his administrative appeal was submitted. (Dkt. No. 18-1).  He states that his first accident was on December 19, 2013 and the second was in January of 2014.

(*Id.*)  Plaintiff alleges that he underwent three surgeries and was not able to walk for three months.  In addition, he alleges that he now must use a walker and may require further surgery and knee replacement in the future. (*Id.*)  Plaintiff has included an "admitting record" from Livingston Hills Rehabilitation Center, dated January 22, 2014, which contains a variety of diagnoses, including "Left Hip FX, Right Femur FX, S/P removal of hardware, Acute pulmonary embolism, DmII, Htn, Hypokalemia, Anemia, Neuropathy, Leukoctosis, Tachycardia." (*Id.* at 3).  Plaintiff has also included a document from Albany Memorial Hospital, dated June 25, 2015, which is a patient discharge information sheet, with directions on wound care and follow-up appointments. (*Id.* at 4).

The rest of plaintiff's submission consists of documents that are already in the record, such as Dr. Kumar Shah's RFC evaluation dated January 9, 2009 and a letter to Dr. Bala from Dr. J. Burdick, dated June 1, 2011. (*Id.* at 5-10, 11-15; *see* T. 378-82 (RFC evaluation), 503-507 (Dr. Burdick's letter and accompanying medical records)). The documents that are already in the record have been considered in this court's analysis.  They would be considered "cumulative" of what is already in the record. However, the documents from recent accidents, documenting plaintiff's worsened condition cannot be considered by the court in the first instance, nor will they support a remand to the Commissioner.

As stated above, plaintiff's last insured date was December 30, 2011, and plaintiff must meet the standard for disability on or before the date he was last insured for purposes of DIB. *See* 20 C.F.R. § 404.131(a) (for a period of disability, you must

have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled).

In order to constitute "new evidence," the plaintiff's documents would have to be "material," relating to the time period in question – December 11, 2006 until December 30, 2011. Clearly, evidence of plaintiff's accidents from 2013, 2014, and any medical records from 2015 are "new," because they were created after the plaintiff's appeal; but they are not "material" because they do not relate to plaintiff's condition during the relevant time period, no matter how serious plaintiff's condition became any time after December 30, 2011.

Thus, plaintiff cannot meet the standard for new evidence, and his motion to consider the additional documents must be denied. The court must consider only the documents in the administrative record to determine if the Commissioner's decision is supported by substantial evidence. Plaintiff's conclusory statement that if the Commissioner had "honored" Dr. Shah's evaluation, these accidents could have been avoided, does not change the fact that the accidents occurred at a time when plaintiff was not insured for purposes of DIB. Plaintiff would have to file a new application with the Social Security Administration, which may require an application for SSI if plaintiff is now financially eligible to do so. Eligibility for SSI is, in part, based upon income, and does not involve a "date last insured." *See* 20 C.F.R. § 416.200 (eligibility for SSI). The court will proceed to consider the existing record.

# VII. TREATING PHYSICIAN/RESIDUAL FUNCTIONAL CAPACITY

## A. Legal Standards

### 1. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. *See* 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

### 2. RFC

In rendering a residual functional capacity ("RFC") determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other

limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

## B.    Application

Plaintiff argues that the ALJ should have "honored" Dr. Shah's opinion that plaintiff suffered from neuropathy. The ALJ found that plaintiff did have diabetic neuropathy. In fact, diabetic neuropathy was one of the impairments that the ALJ found was "severe" at step 2 of the disability analysis. (T. 14). The ALJ did not doubt the diagnosis of diabetic neuropathy, the ALJ doubted the degree of functional limitation that the impairment imposed on plaintiff. In essence, the ALJ found that notwithstanding plaintiff's severe impairments, which included diabetes, hypertension, and diabetic neuropathy, plaintiff still had the RFC to perform his previous work as of December 30, 2011.

Dr. Shah was the plaintiff's treating physician in Brooklyn. After plaintiff

moved to the Albany area, he began treating at Whitney M. Young Jr. Health Services

with several medical providers, including primary care provider, Virinchi Bala, M.D.;

doctor of optometry, Elizabeth Pradhan, O.D.; podiatrist Sandra A. Liaty, DPM; and

Health Coach, Marie Keevern.  The record contains two reports by Dr. Shah.  The first

report is an RFC evaluation, dated January 9, 2009, stating that Dr. Shah began treating

plaintiff every six weeks, beginning December 4, 2006, until August 30, 2008. (T. 378-

82, duplicate at 396-400).  In his RFC evaluation, Dr. Shah stated that plaintiff's

diagnoses were Type 2 Diabetes Mellitus, Anxiety, and Sinus Tachycardia. (T. 378).

Dr. Shah stated that treatment was "inadequate," and that plaintiff suffered from

fatigue, after which he needed to rest for one to four hours. (T. 379, 380).  Dr. Shah also

stated that plaintiff's sinus tachycardia made him short of breath. (T. 380).

In a check-box form,[9] Dr. Shah indicated that plaintiff could "lift and carry"

"frequently (up to 2/3 of a work day)," but did not state a maximum number of pounds

in the space provided. (T. 381).  Dr. Shah stated that plaintiff could stand and walk up

to two hours per day, but he could sit "less than 6 hours per day."[10] (*Id.*)  Dr. Shah

stated that plaintiff was "limited" in pushing and pulling with his upper extremities, but

did not indicate what that limitation might be, even though the form asks for an

explanation of that limitation. (*Id.*)  Dr. Shah also indicated that plaintiff had

---

[9] Although there are some words written on this form, they are barely legible, and some of the handwritten notes refer the reader to the "attached," which may refer to the 2006 Clinical Summary that follows the RFC evaluation and the 2007 Echocardiogram and Doppler report that are attached to the documents submitted by Dr. Shah. (T. 387-91, duplicates at 401-406).

[10] There is no indication of how much "less" than six hours plaintiff could sit.

"manipulative," limitations, but the form contains no explanation of that statement or degree of limitation in the space provided. (*Id.*)

Dr. Shah's second report is a typewritten "Clinical Summary," dated December 4, 2006, with what appears to be a handwritten date of January 9, 2009 next to the typewritten 2006 date. (T. 389-91, duplicate at 403-405). The typewritten summary states that plaintiff had been unable to control his blood sugar since 2004, and that his fasting blood sugar was generally "around 200." (T. 389). Dr. Shah also stated that plaintiff suffered from anxiety, "nervousness," and a "history" of depression, and that he was "led off from Pfizer,"[11] where he worked as a Quality Control Manager. (*Id.*) Plaintiff reported "occasional" tingling and a history of dizziness. (T. 390). Dr. Shah's "Assessment" was Uncontrolled Diabetes Mellitus, Anxiety, Neurosis, Depression, and Sinus Tachycardia. (T. 391). He adjusted plaintiff's medication. The last page of the document indicates that there were "follow ups" on December 11, 2006, December 15, 2006, January 12, 2007, February 1, 2007, and February 20, 2007. The only thing noted on December 11 was that plaintiff's blood sugar was 256, and his medication was increased. (T. 391). The December 15th notation, states that the plaintiff was "examined," but there were no new findings, and the rest of the entries are one sentence long and only note high blood sugar readings of 256, 257, and 323. (*Id.*) The last entry is dated February 20, 2007, and states that Dr. Shah discontinued the Gluocovance and added Januvia, another non-insulin treatment for diabetes. (*Id.*)

Although plaintiff claims that the ALJ should have "honored" Dr. Shah's

---

[11] The court assumes that Dr. Shah intended to write "laid off."

diagnosis of neuropathy, Dr. Shah did not diagnose plaintiff with neuropathy. Plaintiff may be arguing that the ALJ should have adopted Dr. Shah's RFC. However, the ALJ specifically gave Dr. Shaw's RFC determination "little weight." (T. 20). In doing so, the ALJ noted that Dr. Shah last examined plaintiff in August of 2008, but opined in his January 2009 RFC, that plaintiff was able to sit "less than" six hours and walk only two hours in a workday. (T. 20). The ALJ correctly noted that Dr. Shah did not examine plaintiff when he sent the 2009 RFC, and he did not provide any clinical findings in support of his determination. (T. 20). The ALJ also gave Dr. Shah's RFC little weight because it was inconsistent with the other evidence in the record and inconsistent with plaintiff's stated activities. (*Id.*) The court also notes that the RFC evaluation is incomplete, and Dr. Shah did not answer several of the questions that would have been relevant to the plaintiff's RFC. The ALJ was justified in giving Dr. Shah's opinion little weight.

Instead, the ALJ gave Dr. Puri's RFC evaluation of plaintiff's physical abilities great weight, even though Dr. Puri only examined plaintiff once. (T. 20). Dr. Puri examined plaintiff on January 4, 2009, at approximately the same time that Dr. Shah signed his RFC evaluation. Essentially, Dr. Puri found that plaintiff had no limitations other than being careful in "dark situations." (T. 414). Dr. Puri's assessment was not inconsistent with the evidence and is part of a detailed narrative of plaintiff's 2009 examination.

Plaintiff began seeing Dr. Bala on April 10, 2010, after plaintiff moved to Albany area. (T. 453-54). Dr. Bala noted that plaintiff had been diagnosed with diabetes in

2003, and he also determined that initial attempts at regulating blood sugar were unsuccessful.[12] However, Dr. Bala stated that plaintiff was not compliant with his medications and instructed him to be more compliant, but if the current medications were not successful in bringing down his blood sugar, Dr. Bala would adjust or change the medication. (T. 454).

During the April 2010 examination, Dr. Bala found "neurological manifestations" associated with plaintiff's diabetes. He also found elevated blood pressure readings, without diagnosis of hypertension at that time. (T. 453). Dr. Bala stated that he would recheck plaintiff's blood pressure and would start him on medication if it was still elevated. (T. 454). Dr. Bala told plaintiff that his "neuropathy will improve with better control of DM." (T. 454). All other findings were normal. (T. 453-54). Plaintiff had no chest pain, no palpitations, no shortness of breath, and no fatigue. (*Id.*) Plaintiff was referred to a nutritionist and an ophthalmologist for a diabetic eye exam. (T. 454).

Plaintiff did not return to see Dr. Bala until December 13, 2010. (T. 523-24). Dr. Bala noted that plaintiff was "very noncompliant with medications and follow up."[13] (T. 523). Because plaintiff's blood sugar continued to be high, Dr. Bala started plaintiff on insulin in addition to the non-insulin medication that plaintiff was taking. (*Id.*) This combination of medications succeeded in reducing plaintiff's blood sugar significantly.

---

[12] The court notes that plaintiff told Dr. Bala that his blood sugar was 344, and then 355 "this morning," but when plaintiff's blood was tested at the doctor's office, the number dropped to 264. (T. 453, 454).

[13] Plaintiff missed his first appointment with the ophthalmologist. (T. 524).

(T. 523-24, 489, 520). On January 13, 2011, plaintiff reported that, when he took the insulin, his blood sugar varied from 72 to 116. (T. 520). On January 13, 2011, plaintiff also saw the nutritionist, Marie Keevern. Plaintiff explained that he was experiencing hypoglycemia when his blood sugar was so low. (T. 489). Ms. Keevern explained to plaintiff that he could not skip meals and must eat snacks to avoid this situation. (*Id.*) Plaintiff stated that he felt more energy and was "gaining some needed weight." Plaintiff refused to have his blood drawn at the January 13, 2011 appointment because he told Ms. Keevern that "he becomes too nervous when he knows the results of his tests," and high blood sugar made him depressed. (*Id.*)

Without reviewing each of Dr. Bala's reports, the court notes that on April 18, 2011, Dr. Bala noted that plaintiff's blood sugar was under better control, and he referred plaintiff to a neurologist at plaintiff's insistence. (T. 483-84). On August 9, 2011, Dr. Bala adjusted the medication that plaintiff was taking for his hypertension and discontinued plaintiff's Neurontin because it was not helping. (T. 481-82). On November 11, 2011, Dr. Bala noted that plaintiff's diabetes was under better control, and Ms. Keevern stated that plaintiff's eating habits were the reason for his hypoglycemia in the morning. (T. 473-76). On November 16, 2011, plaintiff was "anxious to recite" his good blood sugar levels during a telephone consultation with Ms. Keevern. (T. 477). However, Ms. Keevern noted that plaintiff kept changing the dosages of his medication based upon his morning blood sugar. (*Id.*) There are no reports of numbness in plaintiff's feet or any instability in his gait in any of Dr. Bala's reports.

There is no report of plaintiff mentioning numbness in his feet to Dr. Bala until his March 3, 2012 examination, after the expiration of plaintiff's insured status. (T. 508-510). At that time, Dr. Bala stated that plaintiff had his own fixed ideas on the management of his medical condition, and he was very resistant to suggestions. (T. 509). He was not keeping a log of his blood pressure readings, and believed that he had good blood glucose control. However, that was not the case, and he had developed severe diabetic neuropathy. Plaintiff believed that acupuncture would relieve the neuropathy, but Dr. Bala explained that only good control of his diabetes and hypertension would tend to halt the progress of the diabetic complications. (T. 510). Dr. Bala also diagnosed peripheral vascular disease, but plaintiff did not have any claudication symptoms. (*Id.*) In a section entitled "Preventive Medicine," Dr. Bala recommended that plaintiff quit smoking, stop drinking, improve his diet, prevent injuries, exercise, and use sun screen. (T. 510).

Plaintiff continued to see Dr. Bala and the group at Whitney Young through 2012 and into 2013. In March of 2013 (long after the expiration of plaintiff's insured status), Dr. Bala stated that the control of plaintiff's diabetes was "less than optimal," but noted that this was due to plaintiff's refusal to accept the seriousness of his disease. (T. 592). Even though in 2013, Dr. Bala noted "profound" peripheral neuropathy in both legs, Dr. Bala did not place any physical limitations on plaintiff's activities, and in fact, counseled plaintiff on adding physical activity and exercise into his routine. (T. 594). Thus, Dr. Bala's medical reports are consistent with the ALJ's RFC determination.

On June 1, 2011, plaintiff was examined by neurologist Jeffrey Burdick, M.D.

(T. 457-59). Plaintiff told Dr. Burdick that he was hit in the back of the leg by a car ten years prior.[14] (T. 457). Plaintiff told Dr. Burdick that, shortly after the accident, his feet became numb, but he was not diabetic at the time. He was also having a burning sensation in the anterolateral aspect of the left thigh. (T. 457). Plaintiff told Dr. Burdick that he was examined by a neurologist in New York City and was diagnosed with neuropathy. Plaintiff stated that shortly after an EMG and nerve conduction study, he "became asymptomatic until more recently." (*Id.*)

Dr. Burdick conducted both a physical and a neurological examination. (T. 458-59). The physical examination was normal. As to plaintiff's neurological condition, motor testing revealed full strength in all four extremities with normal muscle tone; normal finger-to-nose, heel-to-shin, and rapid alternating movements were normal. (T. 458). Plaintiff reported diminished vibratory sensation in the distal lower extremities, but his position sense was intact. There was diminished pinprick sensation to the knees bilaterally. Pinprick and light touch were intact in the anterolateral thigh on the left, but plaintiff complained that the area was irritated. Plaintiff's gait was fairly steady and he could perform tandem walking without difficulty.

Dr. Burdick stated that plaintiff's condition was "probably diabetic peripheral neuropathy," but also stated that other sources of peripheral neuropathy should be "ruled out." (T. 459). Dr. Burdick found that the numbness and burning pain in the outer thigh was"likely due to impingement of the left lateral femoral cutaneous nerve at the inguinal ligament," and that this "tends to be a self limited condition and should

---

[14] This is consistent with plaintiff's report to Dr. Bala. (*See e.g.* T. 512).

28

resolve with time." (T. 459). Based on the nerve conduction study, dated July 22, 2011, Dr. Burdick reported that plaintiff's study was "abnormal." (T. 455-56). Dr. Burdick stated that there was evidence of a diffuse mixed axonal and demylinative neuropathy in the lower extremities, which was likely diabetic neuropathy. (T. 456). However, Dr. Burdick also stated that since plaintiff was not experiencing pain with the neuropathy, no pharmacological intervention was required at that time. (*Id.*) Plaintiff was examined by podiatrist, Sandra A. Laity on September 20, 2011. (T. 479-80). Dr. Laity tested for loss of protective sensation on five sites. They all tested negative. (T. 479). Plaintiff's vibratory sensation was decreased on the left, but intact on the right. (*Id.*)

The ALJ also obtained evidence from internist, Leonard M. Rubin, M.D., by sending Dr. Rubin an interrogatory. After reviewing the record, on Novmeber 2, 2012, Dr. Rubin stated that except for affective disorder and decrease in vibratory sense in his lower extremities, "there are no impairments." (T. 579). Dr. Rubin noted that some of the evidence furnished was partly illegible,[15] but the few exhibits that were "germane," did not indicate a physical impairment. The ALJ also asked Dr. Rubin to estimate functional limitations, and Dr. Rubin found that plaintiff could frequently lift up to 20 pounds and occasionally lift up to 100 pounds, but could not determine how much weight plaintiff could carry. (T. 582). He found that plaintiff could sit for eight hours and stand and walk for six hours in an eight hour day. (T. 583). He found that plaintiff could still use his feet "continuously." He stated that "claimant has Diabetes Mellitus without motor or sensory deficit except for decreased vibratory sense in both lower

---

[15] Dr. Rubin may have been referring to Dr. Shah's handwritten notes.

extremities." (T. 584). The only other limitation stated by Dr. Rubin was that plaintiff could only occasionally climb ladders. (T. 585-88). A medical interrogatory was also sent to medical expert, Dr. Aaron Satloff, M.D. to review plaintiff's mental limitations. (T. 535). Dr. Satloff determined that plaintiff had very mild mental limitations, and he found that plaintiff had the mental capacity to perform his prior work. (T. 535).

At both hearings, plaintiff testified to a performing a great many physical activities. During his first hearing, he admitted that between December of 2007 and the date of the hearing in 2010, plaintiff had been "looking for work," even though he denied saying that at his second hearing. (T. 101, 103). At his first hearing, plaintiff testified that he took care of all his own needs, he did laundry, mopped, swept, and took care of the yard. (T. 108). Plaintiff testified that he shoveled snow and did exercises such as jumping jacks, squats, and toe touches. (T. 110-11). At plaintiff's second hearing in 2013, long after his insured status expired, he testified that due to the neuropathy, he could not stand too long, but that he did not have any pain in addition to the numbness. (T. 50). Although plaintiff testified that he felt his balance "leaving" him, he had never fallen because he lost his balance. (T. 52). Plaintiff explained that he believed he could not do his previous work because he felt like he was going to lose his balance and had to sit down. (T. 54). However, when the ALJ asked why plaintiff could not do a sit-down job, he said that he did not know how long he would have to sit, and that at Pfizer, he would be allowed to stand up an move around. (T. 54). The ALJ took plaintiff's testimony into account when expressing in the RFC that plaintiff would have to have a sit/stand option. The ALJ also determined that to the

extent that plaintiff alleged greater limitations, his credibility was weakened due to his own testimony and the objective evidence. (T. 21).

The ALJ had a substantial amount of evidence that was submitted after Dr. Shah's evaluation and after plaintiff had changed medications and had lowered his glucose levels substantially for some time. The ALJ analyzed the evidence in detail in determining plaintiff's RFC. (T. 20). In fact, the ALJ determined, in analyzing Dr. Rubin's opinion, that the record lacked objective evidence to contradict that the claimant could lift and carry in excess of 25 pounds. (T. 21). In addition, the VE testified that the plaintiff's prior work would allow him to alternate positions every hour, so that he would not be forced to sit in one place for six hours. The fact that plaintiff was "diagnosed" with neuropathy, and that he might have had some numbness when he sat or stood for long periods of time, does not entitle him to disability benefits.

In addition, at the hearing, the ALJ questioned the VE about jobs at step five of the sequential evaluation, and the VE testified that even if the ALJ found that plaintiff could not perform his prior work, he could perform a number of alternate jobs that existed in substantial numbers in the national economy. The court concludes that the ALJ's rejection of Dr. Shah's opinion was supported by substantial evidence, and the ALJ RFC determination was supported by substantial evidence. The ALJ properly found that plaintiff was not disabled as of the plaintiff's last insured date.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's determination be **AFFIRMED**, and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: October 21, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge